CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUN 2 4 2014

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Dkt. No. 2:14 CR00011 |
| AVI KLEIN, | ) | 18 U.S.C. §§ 2, 371, 1035(a), 1341, 1343, |
| ALICIA DIETRICH, | ) | 1347, 1349, 1512(b)(2), 1956(h), 1962(d) |
| CHARLES MENTEN, a/k/a CHARLIE | ) | |
| MENTEN, and | ) | |
| VICKIE COX, a/k/a VICKIE MARTIN, | ) | |
| | ) | |
| Defendants. | ) | |

# I N D I C T M E N T

## INTRODUCTION

The Grand Jury charges that at all times relevant to this Indictment:

### Medicare and Virginia Medicaid

1.      Medicare is a health care benefit program under 18 U.S.C. § 24(b) that provides

basic medical coverage to individuals age 65 years or older and to certain disabled persons.  The

United States Department of Health and Human Services ("HHS"), through the Centers for

Medicare and Medicaid Services ("CMS"), is the federal agency charged with administering

Medicare through its contractors.  Medicare reimburses skilled nursing facilities ("SNFs") for up to

100 days of skilled nursing care that follows a qualifying hospital stay.  Medicare also pays for

rehabilitation therapy and pharmacy costs for Medicare beneficiaries.

2.      The Virginia Medical Assistance Program ("Virginia Medicaid") is also a health

care benefit program under 18 U.S.C. § 24(b) that is administered by the Virginia Department of

Medical Assistance Services ("DMAS") to provide health care services and benefits to those who,

due to economic circumstances, are unable to afford such services and benefits.  Virginia Medicaid

is funded jointly by the Commonwealth of Virginia and by CMS, and pays for beneficiaries to receive skilled nursing, rehabilitation, and long-term care in SNFs, and for certain medical expenses and prescription drugs.

3.      Federal law requires that SNFs meet certain requirements, stated at 42 C.F.R. §§ 483.1, et seq. (the "Federal SNF Requirements"), to bill and receive payments from Medicare and Medicaid.  Under these requirements, SNFs must provide, among other things:

a.      Care provided in a manner and in an environment that promotes maintenance or enhancement of each resident's quality of life (42 C.F.R. § 483.15);

b.      A safe, clean, comfortable, and homelike environment, housekeeping and maintenance services necessary to maintain a sanitary, orderly, and comfortable interior, and clean bed and bath linens that are in good condition (42 C.F.R. § 483.15(h));

c.      Care and services necessary to attain or maintain the highest practicable, physical, mental, and psychosocial well-being, in accordance with each resident's comprehensive assessment and plan of care (42 C.F.R. § 483.25);

d.      Care and services that ensure that the residents' abilities in activities of daily living do not diminish unless the circumstances of the resident's clinical condition demonstrate that diminution is unavoidable (42 C.F.R. § 483.25(a)(1));

e.      Care and services that ensure that each resident who is unable to carry out activities of daily living are provided with necessary services to maintain good nutrition, grooming, and personal and oral hygiene (42 C.F.R. § 483.25(a)(3));

f.      Based on a comprehensive assessment, care and services that ensure that residents who enter without pressure sores do not develop them unless their clinical condition demonstrates that pressure sores are unavoidable, and that provide residents with

pressure sores with necessary treatment and services that promote healing, prevent infection, and prevent new sores from developing (42 C.F.R. § 483.25(c));

   g. Sufficient nursing staff to provide nursing and related services to attain and maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care; sufficient numbers of nursing staff, including licensed nurses, other nursing personnel, a licensed nurse to serve as a charge nurse on each shift, the services of a registered nurse for at least 8 consecutive hours a day, 7 days a week, and a registered nurse designated to serve as the director of nursing on a full time basis, to provide nursing care to all residents in accordance with each resident's care plan (42 C.F.R. § 483.30); and

   h. Maintenance of clinical records on each resident in accordance with accepted professional standards and practices that are complete, accurately documented, readily accessible, and systematically organized (42 C.F.R. § 483.75(l)).

  4. Federal law and regulations require that a designated state agency survey each SNF to determine if the facility complies with the Federal SNF Requirements not later than 15 months after the last day of the previous standard survey. The Virginia Department of Health ("VDH") is the state agency responsible for conducting the surveys of SNFs in the Commonwealth of Virginia.

  5. Federal law and regulations authorize CMS to designate a SNF as a Special Focus Facility ("SFF") when surveys find that it consistently provides poor quality of care. CMS may designate a facility an SFF when it periodically makes enough improvement to pass one survey, but fails the next for many of the same problems that were identified in prior surveys due to the failure to address underlying systemic problems giving rise to repeated serious deficiencies. A SNF designated as an SFF is provided with more frequent survey and certification oversight and

progressively more stringent enforcement action.

## The Defendants

6.      Defendant AVI KLEIN ("KLEIN") was a Florida resident and the owner, manager, and operator of a SNF in Weber City, Virginia, in the Western District of Virginia, that was commonly known as the "Brian Center." KLEIN owned, managed, and operated the Brian Center and other SNFs located elsewhere in the United States using a number of limited liability corporations (the "KLEIN LLCs"). The KLEIN LLCs included, but were not limited to, FMSC Weber City Operating Company, LLC, doing business as the Brian Center Health and Rehabilitation Center/Scott County ("FMSC Weber City"), ContiniumCare of Weber City, LLC ("ContiniumCare"), Continium Healthcare Management, LLC, FMSC Leasehold, LLC, AKSG Holdings, LLC, and Family Senior Care Holdings, LLC. KLEIN made all significant operational and financial decisions, controlled the receipt and disbursement of revenues, and directly supervised a number of employees, including defendants ALICIA DIETRICH and CHARLES MENTEN, who helped manage the operation of the SNFs.

7.      Defendant ALICIA DIETRICH ("DIETRICH") was a resident of Ohio and worked directly for KLEIN as the Regional Vice President for Operations and Human Resources. DIETRICH traveled to the Brian Center and the other SNFs to implement KLEIN's policies and decisions, and to manage and supervise the operation and staffing of those facilities.

8.      Defendant CHARLES MENTEN, a/k/a CHARLIE MENTEN ("MENTEN"), was a resident of Florida and worked directly for KLEIN as the Director of Accounting Services and/or Director of Accounts Payable. MENTEN supervised the purchasing and accounts payable for the Brian Center and the other SNFs, regularly and routinely met with KLEIN to review bank balances, and, under KLEIN's supervision and direction, made decisions about the disbursement of the

revenues of the Brian Center and the other SNFs.

9.      KLEIN, MENTEN, DIETRICH and others known and unknown to the Grand Jury,
together with the KLEIN LLCs, were commonly referred to as the "Corporate Office," or
"Corporate," and controlled the operations and finances of the Brian Center and the other SNFs
including, but not limited to, billing and causing the billing of Medicare, Virginia Medicaid, and
private individuals for residents admitted to the Brian Center, and the collection and disbursement
of all revenue.

10.      Defendant VICKIE COX, a/k/a VICKIE MARTIN ("COX"), was a resident of
Tennessee and was a licensed nursing facility administrator.  From in or about and between
December 2008 and January 2011, both dates being approximate and inclusive, COX was the Brian
Center's administrator and managed its daily operations under the direct supervision of KLEIN,
DIETRICH, MENTEN, and others associated with the Corporate Office.

## The Brian Center

11.      The Brian Center was a SNF licensed by the Virginia Department of Health.  In or
about 2006, KLEIN and his associates acquired the Brian Center, which at that time had 60 SNF
beds.  In or about 2007, KLEIN and his associates expanded the facility to 90 SNF beds.  From in
or about 2007 until on or about November 1, 2011, KLEIN and his associates operated the Brian
Center under the legal name of FMSC Weber City Operating Company, LLC, doing business as the
Brian Center Health and Rehabilitation Center/Scott County ("FMSC Weber City").  Beginning on
or about November 1, 2011, KLEIN and his associates changed the legal name to ContiniumCare of
Weber City, LLC ("ContiniumCare"), but continued to operate the facility in the same manner.

12.      On or about June 15, 2006, the Brian Center's administrator signed a CMS Health
Insurance Benefit Agreement ("provider agreement"), on behalf of FMSC Weber City, which stated

that the Brian Center would provide services to Medicare recipients in accordance with the Federal

SNF Requirements, including those described in paragraph 3 of the Introduction of this Indictment.

13.     On or about November 3, 2006, the Brian Center's Director of Nursing, as interim

administrator, signed a Virginia Medicaid nursing home participation agreement on behalf of

FMSC Weber City which stated that the Brian Center would provide services to Virginia Medicaid

recipients in compliance with the Federal SNF Requirements, including those described in

paragraph 3 of the Introduction of this Indictment.

14.     On or about and between September 30, 2008, and October 7, 2008, the VDH

conducted a survey of the Brian Center and, in a CMS survey report, identified more than 40

violations of the Federal SNF Requirements.

15.     On or about and between December 17, 2008, and June 5, 2012, both dates being

approximate and inclusive, the VDH conducted additional standard, complaint, and revisit surveys

of the Brian Center, at least twelve of which identified violations of the Federal SNF Requirements.

16.     On or about January 26, 2010, the VDH sent a letter to COX and KLEIN advising

them that CMS had designated the Brian Center as an SFF due to its history of noncompliance with

quality of care and safety requirements under Medicare over the past three years.

17.     On or about July 21, 2011, CMS notified the Brian Center's administrator that the

facility no longer met the Medicare and Medicaid participation requirements because a VDH survey

on May 11, 2011, and a revisit on July 13, 2011, found that the facility was not in substantial

compliance with the Federal SNF Requirements.  As a result, on or about and between August 11,

2011, and September 7, 2011, both dates being approximate and inclusive, CMS denied Medicare

and Medicaid payments for all new admissions.  On or about September 8, 2011, after a second

VDH revisit found that the deficiencies had been corrected, CMS allowed the Brian Center to

continue to participate in Medicare and Medicaid, ended the denial of payments for new admissions, and imposed a Federal civil monetary penalty.

18.     On or about September 14, 2011, KLEIN initiated the change of the Brian Center's legal name to ContiniumCare by having the Corporate Office's Chief Financial Officer (the "CFO") sign a provider agreement which stated that the Brian Center, under the name ContiniumCare, would provide services to Medicare recipients in accordance with the Federal SNF Requirements, including those described in paragraph 3 of the Introduction of this Indictment.

19.     On or about November 1, 2011, KLEIN, as "Manager" of FMSC Weber City, and the CFO, on behalf of ContiniumCare, signed an "Assignment and Assumption of Contracts" that made it appear that ownership of the Brian Center was transferred from FMSC Weber City to ContiniumCare.

20.     On or about December 1, 2011, CMS notified the Brian Center's administrator that the facility no longer met the Medicare and Medicaid participation requirements because a VDH survey on November 3, 2011, found that the facility was not in substantial compliance with the Federal SNF Requirements.  As a result, on or about and between December 17, 2011, and February 8, 2012, both dates being approximate and inclusive, CMS again denied Medicare and Medicaid payments for all new admissions.  On or about February 9, 2012, the denial of payments for new admissions was withdrawn after a VDH survey found the facility was back in compliance with the Federal SNF Requirements.

21.     On or about May 31, 2012, a VDH survey again found deficiencies and on or about July 17, 2012, CMS sent a notice to the Brian Center's administrator that the facility no longer qualified for participation in Medicare and Medicaid because of its failure to comply with the Federal SNF Requirements.  On or about August 1, 2012, CMS terminated the Brian Center's

Medicare participation agreement. On or about August 31, 2012, KLEIN closed the Brian Center.

<h2 align="center">The Scheme to Defraud</h2>

22.      In or about and between 2007 and the date of this Indictment, both dates being approximate and inclusive, KLEIN, DIETRICH, MENTEN, COX, and their associates did devise and intend to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, by using the Brian Center in a scheme that included at least the following four components: (1) patient care fraud; (2) vendor fraud; (3) employee benefits fraud; and (4) insurance fraud.

**Patient Care Fraud - Manner and Means**

It was a part of the patient care fraud component of the scheme, that:

23.      KLEIN, DIETRICH, MENTEN, COX, and their associates did operate the Brian Center and did cause it to operate in a manner that violated the Federal SNF Requirements, including those described in paragraph 3 of the Introduction of this Indictment.

24.      KLEIN, DIETRICH, MENTEN, COX, and their associates did operate the Brian Center and did cause it to operate without sufficient certified nursing assistants ("CNAs") and supplies.

25.      KLEIN, DIETRICH, MENTEN, COX, and their associates did cause the Brian Center's residents to live in unsanitary and unclean conditions and to be without good nutrition and personal and oral hygiene, including, but not limited to, a lack of bathing, toileting, grooming, cleaning, turning, feeding, and meaningful restorative services.

26.      KLEIN, DIETRICH, COX, and their associates did cause the Brian Center's residents to have neglected and untreated pressure sores, and to develop infections and new pressure sores.

27.     KLEIN, DIETRICH, COX, and their associates did cause the Brian Center's residents to not have medication and treatment as provided for in care plans.

28.     DIETRICH, COX, and their associates did cause the medical and clinical records of the Brian Center's residents to be false, incomplete, and inaccurate to conceal the failure to comply with the Federal SNF Requirements.

29.     KLEIN, DIETRICH, MENTEN, COX, and their associates, did cause the Brian Center's residents to sustain serious bodily injury.

30.     KLEIN, DIETRICH, MENTEN, COX, and their associates did commit acts of wire fraud, in violation of 18 U.S.C. § 1343, by causing interstate wire transmissions to Medicare and Virginia Medicaid that falsely and fraudulently claimed payments for care that violated the Federal SNF Requirements and by causing Medicare and Virginia Medicaid to make payments by interstate wire transmissions for the false and fraudulent claims.

31.     KLEIN, DIETRICH, MENTEN, COX, and their associates did commit acts of mail fraud, in violation of 18 U.S.C. § 1341, and did commit acts of interstate transportation of funds in the amount of $5,000 or more obtained by fraud, in violation of 18 U.S.C. § 2314, by causing bills to be mailed to Brian Center residents, their family members, and other individuals for care that violated the Federal SNF Requirements, thereby causing individuals to transport money of a value of $5,000 or more in interstate commerce to pay those bills.

32.     KLEIN, DIETRICH, MENTEN, COX, and their associates did defraud Medicare and Virginia Medicaid for a number of Brian Center residents including, but not limited to the following:

a.      Resident 15 ("15") was admitted to the Brian Center on or about June 5, 2008.  15 was bedridden and completely dependent on CNAs for all activities of daily living

("ADLs"), to include regular repositioning in bed, toileting assistance, and cleaning when soiled from incontinence. While at the Brian Center, the care of 15 violated the Federal SNF Requirements in that, among other things, 15 was not provided timely and adequate assistance with ADLs, was not regularly repositioned in bed, was not provided toileting assistance, and was not cleaned when soiled from incontinence. In addition, 15 developed pressure sores on the coccyx that were not treated and not recorded in the medical and clinical records. On or about January 12, 2009, one of the pressure sores developed into a substantially-sized, Stage IV sore that was generally not treated, such that on or about February 1, 2009, it worsened and had drainage and a foul odor. DIETRICH and COX did cause false entries to be made in the medical and clinical records to conceal the lack of care, and 15 died on or about February 8, 2009. Virginia Medicaid was billed and made payments by interstate wire transmissions for 15's care at the Brian Center.

b.      Resident 31 ("31") was admitted to the Brian Center on or about June 5, 2010. 31 was bedridden with lower body paralysis, had a high risk for pressure sores, and was completely dependent on CNAs to provide all ADLs, including regular repositioning in bed, toileting assistance, and cleaning when soiled from incontinence. While at the Brian Center, the care of 31 violated the Federal SNF Requirements in that, among other things, 31 was not provided timely and adequate assistance with ADLs, was not regularly repositioned in bed, was not provided with assistance in toileting, was not cleaned, was not provided care for pressure sores, and 31's pressure sores were minimized and concealed in the medical and clinical records. On or about and between June 5, 2010, and July 2, 2010, both dates being approximate and inclusive, 31's pressure sores included one on the lower back described in medical records as a "large sacral wound" with "black eschar,

unstageable" and another described in the medical records as on the "right ischeal tuberosity, also covered" with "black eschar, unstageable." On or about July 12, 2010, during a VDH survey, COX did order Brian Center staff to send 31 to the local hospital to prevent the surveyors from seeing the pressure sores. Hospital staff found the sacral wound to be a severely infected, Stage IV ulcer, with a dressing that was "full of feces." 31 died approximately four months later. Medicare was billed and made payments by interstate wire transmissions for 31's care at the Brian Center.

      c.      Resident 33 ("33") was admitted to the Brian Center on or about June 6, 1993, with severe mental retardation, cerebral palsy, and a seizure disorder. 33 was disabled, contracted in all four limbs, unable to voice needs, was incontinent of bowel and bladder, and was totally dependent on CNAs for all ADLs, including moving, eating, and cleaning. In or about and between 2009 and November 2010, both dates being approximate and inclusive, the care of 33 violated the Federal SNF Requirements in that, among other things, 33 was not provided with timely and adequate assistance with ADLs, was not regularly repositioned, was not fed and cleaned, and was not provided care for pressure sores. In or about August 2010, 33 had pressure sores that were not treated and that were concealed as self-inflicted scratches and cellulitis in false entries in the medical and clinical records. On or about September 22, 2010, a wound care specialist at a local hospital documented 33's pressure ulcers, describing them in the medical records as "on [the] left gluteal fold up in to [the] buttock that is unstageable and measures approximately 3-cm round and has a black eschar across it," and a "stage III pressure ulcer that is draining a large amount of yellow and drainage on [the] left hip." The sores became infected, 33 developed sepsis, and on or about November 22, 2010, 33 died from overwhelming

infection. Both Medicare and Virginia Medicaid were billed and made payments by interstate wire transmissions for 33's care at the Brian Center.

        d.      Resident 35 ("35") was admitted to the Brian Center on or about July 17, 2009. On or about and between December 23, 2011 and May 8, 2012, both dates being approximate and inclusive, orders were placed in 35's medical record for the ongoing treatment of pressure sores on the right foot. The treatment included sending 35 to the wound care clinic at a local hospital on four occasions for additional examination and treatment of the pressure sores. On or about and between May 8, 2012, the date that treatment at the hospital was completed, and May 21, 2012, both dates being approximate and inclusive, the care of 35 violated the Federal SNF Requirements in that, among other things, 35's pressure sores were not monitored and treated such that the pressure sores on the right foot became contaminated with maggots. Virginia Medicaid was billed and made payments by interstate wire transmissions for 35's care at the Brian Center.

33.      KLEIN, DIETRICH, MENTEN, COX, and their associates did defraud individuals of payments for the following Brian Center resident, among others:

        a.      Resident 32 ("32") was admitted to the Brian Center on or about December 14, 2008. 32, who was recovering from a fall, required assistance with movement and ADLs, including repositioning, toileting, and cleaning. In or about March 2009, 32 developed sores on both heels and a Brian Center wound care nurse began a treatment that was time-consuming and required repetition multiple times per shift. Beginning in or about April 2009, COX and her associates discontinued that treatment and substituted ineffective treatments that required less time and fewer repetitions. The care of 32 violated the Federal SNF Requirements in that, among other things, 32's pressure sores were not monitored and

treated, such that they became infected with brown drainage with a foul order. 32 died at the Brian Center on or about May 11, 2009. 32's family was billed by mail and transported and transmitted payments of $5,000 or more in interstate commerce for 32's care at the Brian Center.

**Vendor Fraud – Manner and Means**

It was part of the vendor fraud component of the scheme to defraud that:

34.     KLEIN, MENTEN, and their associates did cause vendors to deliver supplies and services to the Brian Center for billing and payment at a later date.

35.     KLEIN and MENTEN did regularly and routinely meet together to review bank balances and to decide which bills to pay.

36.     As to certain vendors, MENTEN, under KLEIN's supervision, did routinely delay payments, did send payments for less than the amounts due, did fail to make payments, and did make false statements to lull vendors and Brian Center employees about the reasons for nonpayment. The false statements included, but were not limited to, denying receipt of invoices, claiming that invoices were erroneous, stating that payment had been sent when it had not been sent, and claiming that all available funds were used for patient care and payroll leaving no funds available to pay a bill.

37.     KLEIN, MENTEN, and their associates did commit acts of wire fraud, in violation of 18 U.S.C. § 1343, and mail fraud, in violation of 18 U.S.C. § 1341, by transmitting and causing the transmission of interstate wire communications, and by mailing and causing the mailing of materials, that contained false and fraudulent representations and promises to cause vendors to deliver supplies and services to the Brian Center, to induce vendors and others not to report the nonpayment to regulatory authorities, and to influence vendors not to take action to enforce the

collection of unpaid bills.

38.     KLEIN, MENTEN, and their associates did defraud a number of vendors including, but not limited to, the following:

     a.     Building Systems Technology, Inc. ("BSTI") was a vendor in Kingsport, Tennessee, that supplied security equipment.  In or about January 2012, KLEIN and MENTEN did cause the Brian Center's administrator to solicit a quote from BSTI to replace the Brian Center's "Wanderguard" security system, and to request expedited delivery and installation.  In or about February 2012, BSTI installed the new security system with the understanding that it would provide an invoice and receive payment after installation.  On or about May 21, 2012, BSTI sent an invoice to the Corporate Office which KLEIN, MENTEN, and their associates did not pay.

     b.     Enterprise Gas ("EG") was a vendor in Weber City, Virginia, that supplied propane gas to the Brian Center.  EG delivered propane gas to the Brian Center with the understanding that it would send bills to the Corporate Office and receive payment after the deliveries.  In or about and between March 2012 and August 2012, both dates being approximate and inclusive, KLEIN, MENTEN, and their associates did cause EG to deliver propane gas but did not pay for those deliveries.  On or about June 1, 2012, in response to EG's requests for payment, KLEIN, MENTEN, and their associates did cause the Postal Service and a private or commercial interstate carrier to deliver a $4,904.75 check to EG for payment of some of the amounts due.  KLEIN and MENTEN did know that the check was drawn on a closed bank account and would, therefore, be returned unpaid, and KLEIN and MENTEN did not pay EG the amounts owed.

     c.     Elderberry Nursing Homes, LLC ("Elderberry"), owned the building in

which the Brian Center was located and rented it to the Corporate Office for more than $45,000 per month. In or about April 2012, KLEIN, MENTEN, and their associates did stop paying this rent. From in or about and between April 2012 and August 2012, both dates being approximate and inclusive, KLEIN and MENTEN did use interstate wire transmissions to make false lulling statements to Elderberry including, but not limited to, the statement that rent could not be paid because "the revenue that is collected is earmarked for resident care and payroll." KLEIN and MENTEN did know that a substantial part of the Brian Center's revenue was in fact used to make payments for things other than resident care and payroll.

     d.     Scott County Public Service Authority ("SCPSA"), provided water to the Brian Center. In or about and between July 2012 and August 31, 2012, both dates being approximate and inclusive, KLEIN, MENTEN, and their associates did cause the Brian Center to use SCPSA water knowing that KLEIN had decided to close the facility and that the Corporate Office would not pay the bill. By the time KLEIN closed the Brian Center, more than $7,300 was owed to SCPSA for water used by the Brian Center. On or about September 11, 2012, MENTEN did make an interstate telephone call to SCPSA to close the Brian Center's account and did state that if SCPSA sent a final invoice to his attention, it would be paid. MENTEN did know, in fact, that KLEIN did not intend to pay SCPSA. SCPSA mailed the final invoice as directed and KLEIN and MENTEN did not pay the amount due.

## Employee Benefits Fraud – Manner and Means

It was part of the employee benefits fraud component of the scheme to defraud that:

39.     KLEIN did maintain, and cause to be maintained, employee welfare benefit plans, as

defined in 29 U.S.C. § 1002, to provide the Corporate Office and the SNF employees with insurance benefits including, but not limited to, health, dental, vision, accident, and life insurance (the "employee benefit plans" or "plans").

40. KLEIN, DIETRICH, MENTEN, and their associates did administer and manage the employee benefit plans including, but not limited to, selecting the plans, executing and causing the execution of agreements and other plan documents, providing employees with plan information and enrollment documents, causing deductions from payroll for employees' contributions to plan premiums, receiving and reconciling invoices from the insurance providers, and remitting and causing the remittance of premium payments to insurance providers.

41. KLEIN, DIETRICH, and MENTEN did defraud the Brian Center's employees by causing plan premiums to be withheld from the employees' payroll while not providing insurance coverage or not enrolling the employees in the plans, and not paying the withheld premiums to the benefit providers.

42. KLEIN, DIETRICH, MENTEN, and their associates did commit acts of mail fraud, in violation of 18 U.S.C. § 1341, by mailing and causing the mailing of biweekly earning statements that falsely and fraudulently represented to the Brian Center employees that deductions from their wages were being made for the payment of premiums for employee benefit plans.

43. A number of Brian Center employees were defrauded including, but not limited to the following:

     a. CC elected to participate in health and dental insurance plans and authorized payroll deductions for the premiums. In or about and between November 2011 and August 2012, both dates being approximate and inclusive, KLEIN, DIETRICH, MENTEN, and their associates did cause deductions from CC's wages, but did not enroll CC in the plans

and did not remit the deducted premiums to the insurance providers, and did cause CC's biweekly earnings statements to falsely and fraudulently represent that deductions had been made for the payment of health and dental insurance premiums. KLEIN, DIETRICH, MENTEN, and their associates did cause the earnings statements to be sent to CC by the Postal Service and by private or interstate commercial carrier. At times, CC was required to pay health and dental costs and, at other times, was required to forego health and dental services that would otherwise have been covered by the plans.

      b.     HRH elected to participate in the dental insurance plan and authorized payroll deductions for the premiums. In or about and between October 2011 and April 2012, both dates being approximate and inclusive, KLEIN, DIETRICH, MENTEN, and their associates did cause deductions from HRH's wages, but did not enroll HRH in the plan and did not remit the deducted premiums to the insurance provider, and did cause HRH's biweekly earnings statements to falsely and fraudulently represent that deductions had been made for the payment of dental insurance premiums. KLEIN, DIETRICH, MENTEN, and their associates did cause the earnings statements to be sent to HRH by the Postal Service and by private or interstate commercial carrier. At times, HRH was required to pay dental costs and, at other times, was required to forego dental services that would otherwise have been covered by the plan.

      c.     TRL elected to participate in the cancer and accident insurance plans and authorized payroll deductions for the premiums. In or about and between September 2011 and February 2012, both dates being approximate and inclusive, KLEIN, DIETRICH, MENTEN, and their associates did cause deductions from TRL's wages, but did not remit the deducted premiums to the insurance provider and did cause TRL's coverage to be

terminated and the payroll deductions to continue, and did cause TRL's biweekly earnings statements to falsely and fraudulently represent that deductions had been made for the payment of cancer and accident insurance premiums. KLEIN, DIETRICH, MENTEN, and their associates did cause the earnings statements to be sent to TRL by the Postal Service and by private or interstate commercial carrier. At the same time that deductions were made for the insurance premiums, TRL was required to make additional payments directly to the insurance provider to maintain coverage.

   d. NH elected to participate in the cancer insurance plan and authorized payroll deductions for the premiums. In or about and between November 2009 and March 2011, both dates being approximate and inclusive, KLEIN, DIETRICH, MENTEN, and their associates did cause deductions from NH's wages, but did not remit the deducted premiums to the insurance provider and did cause NH's cancer insurance to be terminated and the payroll deductions to continue, and did cause NH's biweekly earnings statements to falsely and fraudulently represent that deductions had been made for the payment of cancer insurance premiums. KLEIN, DIETRICH, MENTEN, and their associates did cause the earnings statements to be sent to NH by the Postal Service and by private or interstate commercial carrier.

   e. KC elected to participate in the dental insurance plan and authorized payroll deductions for the premiums. In or about and between September 2011 and August 2012, both dates being approximate and inclusive, KLEIN, DIETRICH, MENTEN, and their associates did cause deductions from KC's wages, but did not remit the deducted premiums to the insurance provider and did not enroll KC in the dental insurance plan, and did cause KC's biweekly earnings statements to falsely and fraudulently represent that deductions had

been made for dental insurance premiums. KLEIN, DIETRICH, MENTEN, and their associates did cause the earnings statements to be sent to KC by the Postal Service and by private or interstate commercial carrier.

**Insurance Fraud – Manner and Means**

It was part of the insurance fraud component of the scheme to defraud that:

44.     On or about and between July 22, 2009, and July 27, 2009, both dates being approximate and inclusive, COX did make a claim to Liberty Mutual Insurance Company ("Liberty") for damage caused by a lightning strike on the Brian Center. COX did report damage to the fire alarm system and that the Brian Center incurred additional labor costs because of the resulting need for employees to conduct 15-minute fire watches for the safety of the Brian Center's residents.

45.     On or before October 28, 2009, COX did prepare a spreadsheet to support the claim for additional labor costs (the "labor cost spreadsheet") for the 15-minute fire watches. The spreadsheet falsely and fraudulently included a claim for 108 hours of additional work for thirteen employees on twelve different dates when, in fact, those employees were not at work on the dates and at the times claimed. On or about October 28, 2009, COX did send the false labor cost spreadsheet by interstate wire transmission to MENTEN, and MENTEN did provide it to Liberty as part of the claim.

46.     On or about November 6, 2009, COX did send another interstate email to MENTEN confirming that the labor cost spreadsheet included costs for employees who did not work on dates claimed and did enclose a second, revised labor cost spreadsheet that still included more than 105 hours for employees who did not work on the dates claimed. MENTEN did not provide the revised spreadsheet to Liberty.

47.    On or about and between November 6, 2009, and December 15, 2009, both dates being approximate and inclusive, MENTEN did not disclose that the labor cost spreadsheet provided to Liberty included false and fraudulent information and did cause Liberty to continue to consider the false labor costs as part of the claim. The attempt to defraud failed when, on or about December 15, 2009, Liberty denied the claim for labor costs for reasons unrelated to the false spreadsheet.

48.    MENTEN, COX, and their associates did commit wire fraud, in violation of 18 U.S.C. § 1343, by transmitting and causing the transmission of the false labor cost data by interstate email.

### Obstruction of Official Proceeding

49.    On or about and between July 2007 and October 2009, both dates being approximate and inclusive, the United States Department of Labor, Employee Benefits Security Administration ("EBSA"), which has civil enforcement authority relating to employee benefit plans, conducted an official proceeding authorized by 29 U.S.C. § 1134, which gives EBSA authority to conduct investigations, including the authority to require the submission of reports, books, and records and to enter business locations to inspect books and records, to determine whether an employee benefit plan is in compliance with the laws and regulations governing such plans, for the purpose of determining whether EBSA should exercise its statutory enforcement authority.

50.    KLEIN and DIETRICH did corruptly obstruct, influence, and impede, and attempted to corruptly obstruct, influence, and impede, the EBSA investigation through a number of acts, including the following:

a.    In or about and between July 2007 and October 2009, both dates being approximate and inclusive, EBSA employees contacted KLEIN, DIETRICH, and their

associates to require the submission of reports, books, and records relating to the Brian Center's employee benefit plans. KLEIN, DIETRICH, and their associates did repeatedly fail to provide these documents to impede, impair, and obstruct EBSA's investigation.

b. On or about September 9, 2009, DIETRICH did make false statements to an EBSA investigator by stating that she worked for Continium Healthcare Management, LLC, did not administer the Brian Center's employee benefit plans, and did not know who was responsible for the plan when, in fact, she knew that she and KLEIN administered and were responsible for the employee benefit plans.

c. On or about September 9, 2009, an EBSA investigator sent KLEIN a letter, under the authority of 29 U.S.C. § 1134, directing that he appear before the investigator to provide documents and information about the Brian Center's employee benefit plans.

d. On or about September 16, 2009, KLEIN did make false statements to the EBSA investigator by stating that FMSC Leasehold, LLC, had no ownership interest in the Brian Center, that it only housed databases, and that he did not know who administered the Brian Center's employee benefit plans when, in fact, he knew that FMSC Leasehold, LLC had an ownership interest in the Brian Center's operations and that he and DIETRICH administered the Brian Center's employee benefits plans. As a result of these false statements, the EBSA Investigator cancelled the appointment.

### Witness Tampering

51. On or about and between October 31, 2013, and November 12, 2013, both dates being approximate and inclusive, KLEIN and DIETRICH did corruptly persuade and attempt to do so, and did engage in misleading conduct toward a witness to influence, delay, and prevent that witness from testifying in the Federal Grand Jury investigation of matters described in this

Indictment (the "Grand Jury Investigation"). The witness tampering included the following:

a. On an unknown date before October 31, 2013, KLEIN did direct DIETRICH to contact a witness in the Grand Jury Investigation. At the time, the witness was under indictment for charges related to the Grand Jury Investigation.

b. On or about October 31, 2013, DIETRICH did telephone the witness and did state that she was calling at KLEIN's direction to offer KLEIN's "assistance" regarding the pending indictment against the witness. During the conversation, DIETRICH did coach the witness to state that the Brian Center was not "short-staffed" and that "we did nothing wrong." DIETRICH also did coach the witness to state that she did not remember events.

c. On or about November 12, 2013, DIETRICH did again speak to the witness by telephone and did state that KLEIN had directed that she contact the witness to offer assistance and resources, including funds for an attorney, and DIETRICH did further coach the witness to state that "we didn't do anything." DIETRICH did also state that KLEIN's offer of assistance was available only if the witness intended to fight the charges against her and if the witness did "not roll over." DIETRICH did explain that "not roll over" meant that the witness would not enter into an agreement to plead guilty and would not cooperate in the Grand Jury Investigation.

## COUNT ONE
### Racketeering Conspiracy
### 18 U.S.C. § 1962(d)

The Grand Jury charges that:

1. The Introduction of this Indictment is realleged and incorporated as if fully set forth in Count One.

### The Enterprise

2.  Defendants AVI KLEIN, ALICIA DIETRICH, CHARLES MENTEN a/k/a CHARLIE MENTEN, VICKIE COX a/k/a VICKIE MARTIN, and other persons known and unknown to the Grand Jury, together with the Klein LLCs, including FMSC Weber City, ContiniumCare, Continium Healthcare Management, LLC, FMSC Leasehold, LLC, AKSG Holdings, LLC, and Family Senior Care Holdings, LLC, collectively constituted an "Enterprise," as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals and entities associated in fact (hereinafter referred to as the "Brian Center Enterprise" or the "Enterprise"). The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise. The Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

### Purposes of the Enterprise

3.  The purposes of the Enterprise included the following:

a.  Enriching its members and associates through, among other things, mail fraud, wire fraud, interstate transportation of money obtained by fraud, obstruction of justice, and money laundering;

b.  Preserving and protecting the commercial, financial, and personal interests of its members and associates through the use of fraud, deceit, intentional misrepresentations, false documents, withholding of information, affirmatively misleading victims, and other means; and

c.  Promoting and enhancing the Enterprise and its members' and associates' activities.

## Means and Methods of the Enterprise

4.      KLEIN, DIETRICH, MENTEN, COX, and their associates did devise and intend to devise a scheme to defraud and to obtain money by means of false and fraudulent pretenses, representations, and promises that included at least the four components described in the Introduction of this Indictment.

5.      KLEIN, DIETRICH, MENTEN, COX, and their associates did transmit and cause to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud.

6.      KLEIN, DIETRICH, MENTEN, COX, and their associates, for the purpose of executing the scheme to defraud and attempting to do so, did place in any post office and authorized depository for mail matter, certain matters and things to be sent and delivered by the Postal Service, and did deposit and cause to be deposited certain matters and things to be sent and delivered by a private or commercial interstate carrier.

7.      KLEIN, DIETRICH, MENTEN, COX, and their associates did transport and cause to be transported in interstate commerce, in the execution of the scheme to defraud, money having a value of $5,000 or more.

8.      KLEIN, DIETRICH, MENTEN, COX, and their associates did conceal the fraud scheme and their unlawful activities, did obstruct official proceedings, and did tamper with a witness and attempted to do so.

9.      KLEIN, DIETRICH, MENTEN, COX, and their associates did enrich themselves and did promote the activities of the Enterprise by engaging in monetary transactions that included proceeds of the fraud scheme.

## The Racketeering Conspiracy

10.     In or about and between 2007 and the date of this Indictment, both dates being approximate and inclusive, in the Western District of Virginia and elsewhere, defendants AVI KLEIN, ALICIA DIETRICH, CHARLES MENTEN a/k/a CHARLIE MENTEN, and VICKIE COX a/k/a VICKIE MARTIN, and others known and unknown, being persons employed by and associated with the Enterprise, which was engaged in, and the activities of which affected, interstate commerce, did knowingly and intentionally conspire to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1) and (5), consisting of multiple acts indictable under:

a.     18 U.S.C. § 1341 (relating to mail fraud);

b.     18 U.S.C. § 1343 (relating to wire fraud);

c.     18 U.S.C. § 1512 (relating to tampering with a witness);

d.     18 U.S.C. § 2314 (relating to interstate transportation of stolen property); and

e.     18 U.S.C. § 1956 (relating to the laundering of monetary instruments).

11.     It was further a part of the conspiracy that each defendant did agree that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

All in violation of Title 18, United States Code, Section 1962(d).

## COUNT TWO
### Conspiracy to Commit Wire, Mail, and Health Care Fraud
### 18 U.S.C. § 1349

The Grand Jury charges that:

1.     The Introduction of this Indictment is realleged and incorporated as if fully set forth

in Count Two.

2.      In or about and between 2007 and the date of this Indictment, both dates being approximate and inclusive, in the Western District of Virginia and elsewhere, defendants AVI KLEIN, ALICIA DIETRICH, CHARLES MENTEN a/k/a CHARLIE MENTEN, and VICKIE COX a/k/a VICKIE MARTIN, and others known and unknown to the Grand Jury, did knowingly and with the intent to defraud, combine, conspire, confederate, and agree with each other and with others to violate:

a.      Title 18, United States Code, Section 1343 (wire fraud), that is to devise and intend to devise the scheme to defraud described in the Introduction of this Indictment, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and to transmit and cause to be transmitted by means of wire communication in interstate commerce writings, signals, and sounds for the purpose of executing the scheme to defraud, and attempting to do so.

b.      Title 18, United States Code, Section 1341 (mail fraud), that is having devised and intending to devise the scheme to defraud described in the Introduction of this Indictment, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme, and attempting to do so, did knowingly cause to be delivered by the Postal Service and any private or commercial intestate carrier certain matters and things according to the directions thereon.

c.      Title 18, United States Code, Section 1347 (health care fraud), that is knowingly and willfully executed and attempted to execute the scheme to defraud Medicare and Virginia Medicaid described in the Introduction of this Indictment and to obtain by

means of materially false and fraudulent pretenses representations and promises, money and property owned by and under the custody and control of Medicare and Virginia Medicaid in connection with the delivery of and payment for health care benefits, items, and services.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS THREE THROUGH TEN
### Wire Fraud
### 18 U.S.C. § 1343

The Grand Jury charges that:

1.     The Introduction of this Indictment is realleged and incorporated as if fully set forth in Counts Three through Ten.

2.     In or about and between 2007 and the date of this Indictment, both dates being approximate and inclusive, defendants AVI KLEIN, ALICIA DIETRICH, and VICKIE COX a/k/a VICKIE MARTIN, and others known and unknown to the Grand Jury, did devise and intend to devise the patient care fraud component of the scheme to defraud described in the Introduction of this Indictment and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

3.     For each stated Count, on or about each of the stated dates, in the Western District of Virginia and elsewhere, defendants AVI KLEIN, ALICIA DIETRICH, and VICKIE COX a/k/a VICKIE MARTIN, for the purpose of executing the scheme to defraud, and attempting to do so, did cause the wire transmissions in interstate commerce described below:

| Count | Date | Description of Wire Transmission |
|---|---|---|
| 3 | 7/12/2010 | Claim from Weber City, VA to WPS, Madison, WI for Resident 31 for 6/5-30/2010 |
| 4 | 8/9/2010 | Claim from Weber City, VA to WPS, Madison, WI for Resident 31 for 7/2-10/2010 |
| 5 | 9/24/2010 | Claim from Weber City, VA, through server outside VA to Affiliated Computer Services ("ACS"), Richmond, VA Resident 33 for 8/1-31/2010 |

| 6 | 10/22/2010 | Claim from Weber City, VA, through server outside VA to ACS, Richmond, VA for Resident 33 for 9/1-22/2010 |
| 7 | 1/21/2011 | Claim from Weber City, VA to WPS, Madison, WI for Resident 33 for 10/1-22/2010 |
| 8 | 1/21/2011 | Claim from Weber City, VA to WPS, Madison, WI for Resident 33 for 10/29-31/2010 |
| 9 | 2/1/2011 | Claim from Weber City, VA to WPS, Madison, WI, for Resident 33 for 11/1-22/2010 |
| 10 | 6/15/2012 | Claim from Weber City, VA, through server outside VA to ACS, Richmond, VA for Resident 35 for 5/1-31/2012 |

All in violation of Title 18, United States Code, Section 1343.

## COUNT ELEVEN
### Health Care Fraud
### 18 U.S.C. § 1347

The Grand Jury charges that:

1.    The Introduction of this Indictment is realleged and incorporated as if fully set forth in Count Eleven.

2.    In or about and between 2007 and the date of this Indictment, both dates being approximate and inclusive, in the Western District of Virginia and elsewhere, defendants AVI KLEIN, ALICIA DIETRICH, and VICKIE COX a/k/a VICKIE MARTIN, and others known and unknown to the Grand Jury, did knowingly and willfully execute and attempt to execute the patient care fraud component of the scheme to defraud described in the Introduction of this Indictment, to defraud health care benefit programs as defined by Title 18, United States Code, Section 24(b), that is Medicare and Virginia Medicaid, and to obtain by means of false and fraudulent pretenses, representations and promises, money and property owned by and under the custody and control of Medicare and Virginia Medicaid in connection with the delivery of and payment for health care benefits, items and services.

3.    The violation resulted in serious bodily injury to a number of Brian Center residents, including residents 15, 31, 33, and 35.

All in violation of Title 18, United States Code, Section 1347.

**COUNTS TWELVE AND THIRTEEN**
**Wire Fraud**
**18 U.S.C. § 1343**

The Grand Jury charges that:

1.      The Introduction of this Indictment is realleged and incorporated as if fully set forth in Counts Twelve and Thirteen.

2.      In or about and between 2007 and the date of this Indictment, both dates being approximate and inclusive, defendants AVI KLEIN and CHARLES MENTEN a/k/a CHARLIE MENTEN, and others known and unknown to the Grand Jury, did devise and intend to devise the vendor fraud component of the scheme to defraud described in the Introduction of this Indictment and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

3.      For each stated Count, on or about each of the stated dates, in the Western District of Virginia and elsewhere, defendants AVI KLEIN and CHARLES MENTEN a/k/a CHARLIE MENTEN, for the purpose of executing the scheme to defraud, and attempting to do so, did cause the described wire transmission in interstate commerce:

| Count | Date | Description of Wire Transmission |
|-------|------|--------------------------------|
| 12 | 6/8/2012 | Email from MENTEN, Miami, FL, to Elderberry, Lynchburg, VA, and KLEIN |
| 13 | 9/11/2012 | Telephone call between Gate City, VA and Miami, FL |

All in violation of Title 18, United States Code, Section 1343.

**COUNT FOURTEEN**
**Mail Fraud**
**18 U.S.C. § 1341**

The Grand Jury charges that:

1. The Introduction of this Indictment is realleged and incorporated as if fully set forth in Count Fourteen.

2. In or about 2007 and the date of this Indictment, both dates being approximate and inclusive, defendants AVI KLEIN and CHARLES MENTEN a/k/a CHARLIE MENTEN, and others known and unknown to the Grand Jury, did devise and intend to devise the vendor fraud component of the scheme to defraud described in the Introduction of this Indictment and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

3. On or about June 1, 2012, in the Western District of Virginia and elsewhere, defendants AVI KLEIN and CHARLES MENTEN a/k/a CHARLIE MENTEN, for the purpose of executing and attempting to execute the scheme to defraud, did knowingly cause to be delivered by mail and private or commercial interstate carrier according to the direction thereon the following matter: Regions Bank check no. 002244 in the amount of $4,904.75 payable to EG and drawn on the closed account of ContiniumCare.

All in violation of Title 18, United States Code, Section 1341.

**COUNTS FIFTEEN through SIXTY-EIGHT**
**Mail Fraud**
**18 U.S.C. § 1341**

The Grand Jury charges that:

1. The Introduction of this Indictment is realleged and incorporated as if fully set forth in Counts Fifteen through Sixty-Eight.

2. In or about and between 2007 and the date of this Indictment, both dates being approximate and inclusive, defendants AVI KLEIN, ALICIA DIETRICH, and CHARLES MENTEN a/k/a CHARLIE MENTEN, and others known and unknown to the Grand Jury, did

devise and intend to devise the employee benefits fraud component of the scheme to defraud described in the Introduction of this Indictment.

3.    For each stated Count, on or about each of the stated dates, in the Western District of Virginia and elsewhere, defendants AVI KLEIN, ALICIA DIETRICH, and CHARLES MENTEN a/k/a CHARLIE MENTEN, for the purpose of executing and attempting to execute the scheme to defraud, did knowingly cause to be delivered by mail and private or commercial interstate carrier according to the direction thereon, the described matter:

| Count | Date | Description of Delivered Matter |
|-------|------|-------------------------------|
| 15 | 11/27/ 2009 | Earnings Statement for Nov. 5-18, 2009 for NH |
| 16 | 12/10/2009 | Earnings Statement for Nov. 19-Dec. 2, 2009 for NH |
| 17 | 12/24/2009 | Earnings Statement for Dec. 3-16, 2009 for NH |
| 18 | 1/8/2010 | Earnings Statement for Dec. 17-30, 2009 for NH |
| 19 | 1/22/2010 | Earnings Statement for Dec. 31, 2009-Jan. 13, 2010 for NH |
| 20 | 2/5/2010 | Earnings Statement for Jan. 14-27, 2010 for NH |
| 21 | 2/19/2010 | Earnings Statement for Jan. 28-Feb. 10, 2010 for NH |
| 22 | 3/5/2010 | Earnings Statement for Feb. 11-24, 2010 for NH |
| 23 | 3/19/2010 | Earnings Statement for Feb. 25-Mar. 10, 2010 for NH |
| 24 | 4/2/2010 | Earnings Statement for Mar. 11-24, 2010 for NH |
| 25 | 4/16/2010 | Earnings Statement for Mar. 25-Apr. 7, 2010 for NH |
| 26 | 4/30/2010 | Earnings Statement for Apr. 8-21, 2010 for NH |
| 27 | 5/14/2010 | Earnings Statement for Apr. 22-May 5, 2010 for NH |
| 28 | 5/28/2010 | Earnings Statement for May 6-19, 2010 for NH |
| 29 | 6/11/2010 | Earnings Statement for May 20-June 2, 2010 for NH |
| 30 | 6/25/2010 | Earnings Statement for June 3-16, 2010 for NH |
| 31 | 7/9/2010 | Earnings Statement for June 17-30, 2010 for NH |
| 32 | 7/23/2010 | Earnings Statement for July 1-14, 2010 for NH |
| 33 | 8/6/2010 | Earnings Statement for July 15-28, 2010 for NH |
| 34 | 8/20/2010 | Earnings Statement for July 29-Aug. 11, 2010 for NH |
| 35 | 9/3/2010 | Earnings Statement for Aug. 12-25, 2010 for NH |
| 36 | 9/17/2010 | Earnings Statement for Aug. 26-Sept.8, 2010 for NH |
| 37 | 10/1/2010 | Earnings Statement for Sept. 9-22, 2010 for NH |
| 38 | 10/15/2010 | Earnings Statement for Sept. 23-Oct. 6, 2010 for NH |
| 39 | 10/29/2010 | Earnings Statement for Oct. 7-20, 2010 for NH |
| 40 | 11/12/2010 | Earnings Statement for Oct. 21-Nov. 3, 2010 for NH |
| 41 | 11/26/2010 | Earnings Statement for Nov. 4-17, 2010 for NH |
| 42 | 12/10/2010 | Earnings Statement for Nov. 18-Dec. 1, 2010 for NH |

| 43 | 12/23/2010 | Earnings Statement for Dec. 2-15, 2010 for NH |
| 44 | 1/7/2011 | Earnings Statement for Dec. 16-29, 2010 for NH |
| 45 | 1/21/2011 | Earnings Statement for Dec. 30, 2010-Jan. 12, 2011 for NH |
| 46 | 2/4/2011 | Earnings Statement for Jan. 13-26, 2011 for NH |
| 47 | 3/4/2011 | Earnings Statement for Feb. 10-23, 2011 for NH |
| 48 | 9/30/2011 | Earnings Statement for Sept. 15-28, 2011 for TRL |
| 49 | 10/14/2011 | Earnings Statement for Sept. 29-Oct. 5, 2011 for TRL |
| 50 | 10/28/2011 | Earnings Statement for Oct. 6-19, 2011 for TRL, KC |
| 51 | 11/10/2011 | Earnings Statement for Oct. 20-Nov. 2, 2011 for HRH, TRL, KC |
| 52 | 11/25/2011 | Earnings Statement for Nov. 3-16, 2011 for HRH, TRL, KC |
| 53 | 12/9/2011 | Earnings Statement for Nov. 17-30, 2011 for CC, HRH, TRL, KC |
| 54 | 12/23/2011 | Earnings Statement for Dec. 1-14, 2011 for CC, HRH, TRL, KC |
| 55 | 1/6/2012 | Earnings Statement for Dec. 15-28, 2011 for CC, HRH, TRL, KC |
| 56 | 1/20/2012 | Earnings Statement for Dec. 29, 2011 – Jan. 11, 2012 for CC, HRH, TRL, KC |
| 57 | 2/3/2012 | Earnings Statement for Jan. 12-25, 2012 for CC, HRH, TRL, KC |
| 58 | 2/17/2012 | Earnings Statement for Jan. 26, 2012 – Feb. 8, 2012 for CC, HRH, TRL, KC |
| 59 | 3/2/2012 | Earnings Statement for Feb. 9 – 22, 2012 for CC, TRL, KC |
| 60 | 3/16/2012 | Earnings Statement for Feb. 23, 2012 – Mar. 7, 2012 for CC, TRL, KC |
| 61 | 3/30/2012 | Earnings Statement for Mar. 8 – 21, 2012 for CC, TRL, KC |
| 62 | 4/13/2012 | Earnings Statement for Mar. 22, 2012 – Apr. 4, 2012 for CC, TRL, KC |
| 63 | 4/27/2012 | Earnings Statement for Apr. 5-18, 2012 for CC, KC |
| 64 | 5/11/2012 | Earnings Statement for Apr. 19, 2012 – May 2, 2012 for CC, KC |
| 65 | 5/25/ 2012 | Earnings Statement for May 3-16, 2012 for CC, KC |
| 66 | 6/8/2012 | Earnings Statement for May 17-30, 2012 for CC, KC |
| 67 | 6/22/2012 | Earnings Statement for June 1-13, 2012 for KC |
| 68 | 7/6/2012 | Earnings Statement for June 14-27, 2012 for KC |

All in violation of Title 18, United States Code, Section 1341.

## COUNT SIXTY-NINE
### Witness Tampering
### 18 U.S.C. §§ 2 and 1512(b)(2)(A)

The Grand Jury charges that:

1.     The Introduction of this Indictment is realleged and incorporated as if fully set forth in Count Sixty-Nine.

2.     On or about and between October 31, 2013 and November 12, 2013, both dates being approximate and inclusive, in the Western District of Virginia and elsewhere, defendants AVI KLEIN and ALICIA DIETRICH, as principals and aiders and abettors, did knowingly intimidate,

corruptly persuade, and engage in misleading conduct, and did attempt to intimidate, corruptly

persuade, and engage in misleading conduct, toward GB, with the intent to cause and induce GB to

withhold testimony from an official proceeding, that is, a Federal Grand Jury investigation into the

matters described in this Indictment.

All in violation of Title 18, United States Code, Sections 2 and 1512(b)(2)(A).

## COUNT SEVENTY
### Money Laundering Conspiracy
### 18 U.S.C. § 1956(h)

The Grand Jury charges that:

1. The Introduction of this Indictment is realleged and incorporated as if fully set forth

in Count Seventy.

2. In or about and between October 2008 and the date of this Indictment, both dates

being approximate and inclusive, in the Western District of Virginia and elsewhere, defendants AVI

KLEIN and CHARLES MENTEN a/k/a CHARLIE MENTEN did knowingly combine, conspire,

and agree with each other and with persons known and unknown to the Grand Jury to commit

offenses against the United States in violation of 18 U.S.C. § 1957, that is, to knowingly engage and

attempt to engage, in monetary transactions by, through, and to a financial institution, affecting

interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that

is checks drawn on accounts at various banks, including Regions Bank and Citibank, such property

having been derived from a specified unlawful activity, that is, wire fraud in violation of 18 U.S.C.

§ 1343, mail fraud in violation of 18 U.S.C. § 1341, and interstate transportation of money obtained

by fraud in violation of 18 U.S.C. § 2314.

### Manner and Means

3. The manner and means used to accomplish the objectives of the conspiracy included

the following, among others:

     a.     KLEIN, MENTEN, and their associates, with the intent to defraud, did devise and willfully participate in, with knowledge of its fraudulent nature, the scheme to defraud described in the Introduction of this Indictment.

     b.     KLEIN, MENTEN, and their associates did deposit, and did cause the deposit of, the proceeds of the scheme to defraud into bank accounts, including Regions Bank branches in Kingsport, Tennessee, and Bay Harbor Islands, Florida, and Citibank in Miami, Florida.

     c.     On or about the stated dates, KLEIN and MENTEN did engage in and cause monetary transactions in property derived from the scheme to fraud including, but not limited to, the following:

| Date | Description of Monetary Transaction |
|---|---|
| 10/8/2008 | Regions Bank-FMSC Weber City Operating Company, LLC, check no. 178, $22,296.00, to Continium Management, LLC |
| 4/1/2009 | Regions Bank-FMSC Weber City Operating Company, LLC, check no. 612, $12,500.00 to Jewish Learning Center |
| 8/10/2010 | Regions Bank-Continium Healthcare Management, LLC, check no. 711, $20,000.00 to Avi Klein |
| 3/15/2011 | Regions Bank-FMSC Weber City Operating Company, LLC, check no. 2579, $23,059.00 to Continium Management, LLC |
| 6/8/2012 | Regions Bank-ContiniumCare of Weber City LLC check no. 2255, $20,000.00, to 925 Wagner Operating Co. |
| 8/31/2012 | Citibank-ContiniumCare of Weber City check no. 000092, $50,000.00, to The Bernstein Law Firm |

All in violation of Title 18, United States Code, Section 1956(h).

**COUNT SEVENTY-ONE**
**Conspiracy to Make False Statements**
**18 U.S.C. § 371**

The Grand Jury charges that:

1.     The Introduction of this Indictment is realleged and incorporated as if fully set forth in Count Seventy-One.

2.     In or about and between 2007 and the date of this Indictment, both dates being approximate and inclusive, in the Western District of Virginia and elsewhere, defendants ALICIA DIETRICH and VICKIE COX a/k/a VICKIE MARTIN, and others known and unknown to the Grand Jury, did knowingly and willfully conspire and agree together and with each other to commit an offense against the United States, that is, making false statements relating to health care matters, in violation of Title 18, United States Code, Section 1035(a)(2).

### Manner and Means of the Conspiracy

3.     It was a part of the conspiracy that the Brian Center was operated without sufficient certified nursing assistants and did not provide care required by the Federal SNF Requirements for its residents. Medicare and Virginia Medicaid paid for the care of most of the residents.

4.     It was further a part of the conspiracy that defendants DIETRICH and COX, and others known and unknown to the Grand Jury, did routinely order and direct the Brian Center's nursing staff to make materially false, fictitious, and fraudulent entries in the residents' medical records in connection with the delivery of and payment for health care benefits, items, and services.

5.     It was further a part of the conspiracy that defendants DIETRICH and COX, and others known and unknown to the Grand Jury, did periodically meet, at times in anticipation of government surveys and audits, to review the Brian Center's medical records, and did make, and did cause to be made, false and fraudulent entries in these records, commonly referred to as "filling in the holes."

6.     It was further a part of the conspiracy that defendants DIETRICH and COX did supervise and direct the making of entries in medical records that were materially false and

fraudulent in that the entries were intended to make it appear that adequate care in compliance with the Federal Nursing Facility Requirements, including those stated in paragraph 3 of the Introduction of this Indictment, was provided to the Brian Center's residents when in fact the care provided failed to comply with the Federal Nursing Facility Requirements.

## Overt Acts

In furtherance of the conspiracy and to accomplish its objects, the overt acts described below, among others, were committed in the Western District of Virginia and elsewhere.

7-27.   On or about the stated dates a conspirator did knowingly and willfully make and cause to be made the materially false, fictitious, and fraudulent statements and representations and the materially false writings and documents, as described, knowing that they contained materially false, fictitious, and fraudulent statements and entries in connection with the delivery of and payment for health care services involving health care benefit programs as defined in 18 U.S.C. § 24(b):

| Overt Act ¶ | Date | Description |
|---|---|---|
| 7 | September 12, 2009 | Resident 35–Rehabilitation/Restorative Service Delivery Record |
| 8 | December 19, 2009 | Resident 35-Treatment Administration Record ("TAR"), GS Petroleum Jelly, Apply to BLE Twice Daily |
| 9 | January 1, 2010 | Resident 35–Bath Sheet |
| 10 | January 28, 2010 | Resident 35-TAR, GS Petroleum Jelly, Apply to BLE Twice Daily |
| 11 | May 21, 2010 | Resident 35–TAR, Weekly Skin Assessment |
| 12 | June 6, 2010 | Resident 31- TAR, Weekly Skin Assessment |
| 13 | June 6, 2010 | Resident 31-TAR, Apply Santyl Ointment to Unstageable Wound |
| 14 | June 10, 2010 | Resident 31-TAR, Apply Santyl Ointment to Unstageable Wound |
| 15 | June 12, 2010 | Resident 31-TAR, Change Dressing to Picline |
| 16 | June 12, 2010 | Resident 31-TAR, Change Caps to Picline |
| 17 | June 18, 2010 | Resident 31-TAR, Apply Santyl Ointment to Unstageable Wound |
| 18 | June 20, 2010 | Resident 31-TAR, Apply Skin Prep to stage IV pressure ulcer inner aspect of Rt heel Q shift |
| 19 | June 26, 2010 | Resident 31-TAR, Change Caps to Picline |
| 20 | June 26, 2010 | Resident 31-TAR, Change Dressing to Picline |
| 21 | June 27, 2010 | Resident 31-TAR, Apply Exiderm to Stage II Pressure Ulcer |

| 22 | July 5, 2010 | Resident 31–Rehabilitation/Restorative Service Delivery Record |
| 23 | July 9, 2010 | Resident 31–Rehabilitation/Restorative Service Delivery Record |
| 24 | July 23, 2010 | Resident 35–TAR, Weekly Skin Assessment |
| 25 | September 12, 2010 | Resident 35–TAR, Weekly Skin Assessment |
| 26 | September 19, 2010 | Resident 35–TAR, Weekly Skin Assessment |
| 27 | September 25, 2010 | Resident 35–TAR, Weekly Skin Assessment |

All in violation of Title 18, United States Code, Section 371.

## NOTICE OF FORFEITURE

1.      Upon conviction of a violation of 18 U.S.C. § 1962, as alleged in Count One of this Indictment, pursuant to 18 U.S.C. § 1963, defendants AVI KLEIN, ALICIA DIETRICH, CHARLES MENTEN a/k/a CHARLIE MENTEN, and VICKIE COX a/k/a VICKIE MARTIN, shall forfeit to the United States:

a.      any interest acquired or maintained in violation of 18 U.S.C. § 1962;

b.      any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which the defendants established, operated, controlled, conducted, or participated in the conduct of, in violation of 18 U.S.C. § 1962; and

c.      any property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of 18 U.S.C. § 1962.

2.      Upon conviction of one or more of the felony offenses alleged in Counts Two through Sixty-Eight and Seventy of this Indictment, the defendants shall forfeit to the United States:

a.      any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. §§ 1341,1343, 1347, and 1349, pursuant to 18 U.S.C. § 981(a)(1)(C) and 982(a)(7), and 28 U.S.C. § 2461.

b.     any property, real or personal, involved in a violation of 18 U.S.C. §§ 1956

and 1957, or any property traceable to such property, pursuant to 18 U.S.C. § 982(a)(1).

3.     The property to be forfeited to the United States includes, but is not limited to, the

following property:

a.     Money Judgment

(1)     Not less than $10,668,026, in United States currency and all interest
and proceeds traceable thereto, in that such sum in aggregate was obtained directly
or indirectly as a result of said offenses or is traceable to such property;

(2)     Not less than $1,063,007.00, that sum being the total of the interests
acquired or maintained by defendant AVI KLEIN in violation of Title 18 U.S.C.
§ 1962;

(3)     Not less than $589,437.00, that sum being the total of the interests
acquired or maintained by defendant ALICIA DIETRICH in violation of 18 U.S.C.
§ 1962;

(4)     Not less than $350,222.00, that sum being the total of the interests
acquired or maintained by defendant CHARLES R. MENTEN a/k/a Charlie Menten,
in violation of 18 U.S.C. § 1962;

(5)     Not less than $203,234.00, that sum being the total of the interests
acquired or maintained by defendant VICKIE COX a/k/a VICKIE MARTIN, in
violation of 18 U.S.C. § 1962.

b.     Real Estate

(1)     Real property located at 5030 Pine Tree Drive, Miami, Florida.

c.     Vehicles

(1)     2014 Harley Davidson motorcycle, 1HD01JRV12EB024091;
(2)     2007 White 2D Bentley Convertible, SCBDR33W87C050701; and
(3)     2010 Toyota FJ 4wd SUV, VIN: JTEBU4BFXAK093617.

d.     All assets, real and personal, held or administered by Surprise Lake
Holdings, LLC, including but not limited to real property located at 5005 Lakeview Drive,
Miami, Florida, and the entity itself;

e.     All assets, real and personal, held or administered by Family Senior Care

Holdings, LLC, including the entity itself;

       f.      All assets, real and personal, of any Defendant held or administered by Ridge Clearing & Outsourcing, and/or Pension Financial Services, Inc., and/or Apex Clearing Corporation;

       g.      Citibank, Marquis Bank, Regionsbank, and Stonegate Bank accounts described in Appendix A of this Indictment;

       h.      Any interest in, security of, claim against or property or contractual right of any kind affording a source of influence over any enterprise established, operated, controlled or conducted by the defendants;

       i.      Proceeds acquired or maintained by the Enterprise, or any individual or entity comprising the Enterprise which are derived from racketeering activity; and

       j.      All accounts receivable reflecting any sum of money owed to the defendants for services rendered, and any assets owned by said defendants.

4.      The above-named defendants, and each of them, are jointly and severally liable for the forfeiture obligations as alleged above.

5.      If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

       a.      cannot be located upon the exercise of due diligence;
       b.      has been transferred or sold to, or deposited with, a third person;
       c.      has been placed beyond the jurisdiction of the Court;
       d.      has been substantially diminished in value; or
       e.      has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek forfeiture of any other property of the defendants up to the value of the above-described forfeitable property, pursuant to 18 U.S.C. § 1963(m) and 21 U.S.C. § 853(p).

A TRUE BILL: June 24, 2014.

_Jeana C. Lepert_
Grand Jury Foreperson

_Timothy J. Heaphy (by RAM)_
Timothy J. Heaphy
United States Attorney
Western District of Virginia
Rick A. Mountcastle, Assistant United States Attorney
Daniel P. Bubar, Assistant United States Attorney
Joseph E.H. Atkinson, Special Assistant United States Attorney